IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

MICHELLE D. PHARR,

      Plaintiff,

vs.

                               Case Number:  2:12-cv-036

LANDMARK HOTEL GROUP, LLC

      Defendant.

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff Michelle D. Pharr filed this action against Defendant Landmark Hotel Group,

LLC ("Landmark") alleging (1) that she was harassed and discriminated against because of her

sex and (2) retaliated against for opposing this alleged conduct in violation of Title VII of the

Civil Rights Act of 1964.

In her Complaint, Plaintiff alleges that fellow Landmark owner, Raj Jain, engaged in

conduct that created a hostile work environment.  It is important to note that when Plaintiff first

started as an employee of Landmark in 1992, she and Mr. Jain forged a close relationship.

Plaintiff was eager to learn about the hotel business, and Mr. Jain acted as her mentor.  The two

also engaged in a consensual, sexual relationship.  While their sexual intimacy initially ended

sometime in 1997 or 1998 when Plaintiff became involved with her now husband, David Pharr,

the two remained close and continued to be romantically involved.  Plaintiff often emailed Mr.

Jain, soliciting advice about personal issues and investments, and Mr. Jain did the same.  They

also shared close family bonds.  Plaintiff asked Mr. Jain to be a participant in her wedding, and

Plaintiff spent two weeks in India celebrating Mr. Jain's son's wedding at her expense.  They

often inquired about each other's families, and they shared pictures of happy moments with their children and grandchildren.

Plaintiff rose up the ranks in Landmark. By 1995, Plaintiff was a part owner of various Landmark hotels, and her investments grew throughout the next decade. By 2007 she was Vice President of Landmark's two North Carolina properties, Comfort Inns North and South, and by 2008 she served as General Manager for both. The company made her a millionaire, and she started expanding her personal investments outside of Landmark. However, when the recession hit, business tanked, Landmark stopped making distributions to its owners, and Plaintiff was forced to rely on her approximately $60,000 a year income as General Manager. Even though Plaintiff was the only Landmark owner receiving a paycheck during those hard times, her personal expenses started exceeding her earnings.

By 2010 financial problems plagued the Comfort Inns North and South—cash deposits were chronically late, the hotels' accounting program was not timely updated, checks were written on over-drafted accounts, and accounts receivable exceeded $300,000.

Plaintiff and Mr. Jain continued some physical intimacy, with varying frequency, throughout their relationship, until July 2010 when Mr. Jain confronted Plaintiff about the accounts receivable. He told Plaintiff that their personal relationship was on hold until the accounts receivable were reconciled. He assigned fellow owner, Raj Rahil, to examine the full scope of the matter.

On July 14, 2010, Plaintiff sent Mr. Jain an email that began, "**You have lost faith in me** . . . ." Attached was a letter that continued,

> **You have been pulling away for some time** . [] I will move on with my family and you with yours . . . . I want 2.5 million net . . . .You've given to Akhil [a]nd Mr. Rahil. I don't think they earned what they have either. I want a good life too . . . . We can draw up legal documents, I will agree not to sue you or [Landmark]

2

for any reason such as sexual harassment and or sexual discrimination . . . . **We have had a great journey together.**

Pharr Ex. 3 to Pl. Dep., attached as Ex. 1 (emphasis added).  Mr. Jain believed that Plaintiff was stressed out over the accounts receivable.  Plus, at that time she was involved in personal litigation that involved the development of her Ocracoke properties.

By fall 2010 the North Carolina bank accounts reflected that only a few cash deposits were made for the month of August, one of the hotels' busiest months.  By November 2010, the cash deficit was over $100,000.  Mr. Jain brought the deficit to Plaintiff's attention, and less than a week later, the account was full—paid by deposits written from Plaintiff's personal bank account.  In her deposition testimony, Plaintiff admitted that she failed to make the cash deposits on a daily basis, in accordance with Landmark's practice.  Instead of depositing the cash, she took cash home each night.

On December 13, 2010, Plaintiff was removed from her position as General Manager and assigned the responsibility to collect on the accounts receivable.  The next day, Plaintiff sent an email to Mr. Jain telling him that she believed that up to that point, she "had done well maintaining separation with personal and professional."  Pharr Ex. 46 to Pl. Dep., attached as Ex. 2.  She mentioned that Mr. Jain "wanted [her] to be honest with [her husband]," but she did not know "exactly what parts of the truth" she was supposed to tell him.  Id.  She claimed that she "did everything thinking [Mr. Jain] was looking out for [her]."  Id.  Plaintiff stated that she "could have looked at Akhil on Monday and told him [she had] been involved sexually with [his dad] for the last 20 years."  Id.  She was "worn out failing to separate personal and professional."  Id.  She concluded, "That is the truth."  Id.

A week later, Plaintiff's attorney contacted Mr. Jain and informed him that Plaintiff wished to withdraw as an LLC member of the hotels in which she was a part owner.  Plaintiff's employment with Landmark was terminated the following day.

On January 15, 2011, Plaintiff resent her July 14, 2010 email to Mr. Jain, reaffirming and readopting its contents.  Plaintiff wanted $2.5 million.  Mr. Jain refused, and Plaintiff sued.

Plaintiff alleges that Landmark Hotel Group retaliated against her for terminating her employment after her "complaint" of sex discrimination sent in the form of her July 14, 2010 email.  She specifically contends that Landmark manufactured the appraisal for the buyout of her membership share, withheld distributions, tried to bankrupt her, sent her into financial ruin, created a hostile work environment, fabricated lies, and failed to investigate.  However, Plaintiff was terminated after her own request to withdraw her membership with various Landmark hotels and only after mounting evidence that she embezzled hundreds of thousands of dollars from the company.  In fact, Plaintiff is currently under investigation by the North Carolina State Bureau of Investigations for embezzlement.

Plaintiff admits that she has no evidence other than her unsubstantiated testimony that Mr. Jain sexually harassed her and that Landmark retaliated against her.  In fact, all of the evidence supports the conclusion that she had a consensual affair with Mr. Jain, that Landmark had legitimate, non-retaliatory reasons for discharging her, and that her July 14, 2010 email was nothing more than an attempt to extort money from Mr. Jain and Landmark.

## UNDISPUTED FACTS

Pursuant to Local Rule 56(B), Landmark lists the following facts as to which it contends there is no genuine issue:

1.      Landmark operates various hotel investment properties in Virginia and North

Carolina, and Landmark has various members who own varying percentages of each property.

See Declaration of Raj Jain, attached as Ex. 3, ¶¶ 3-4 ("Declaration").

2.      Plaintiff began working for Landmark in 1992.  See Amended Complaint ¶ 2,

attached as Ex. 4 ("Compl.").  Early in her career, Plaintiff became General Manager of Comfort

Inn South on the Outer Banks of North Carolina.  Declaration ¶ 7.  As a General Manager,

Plaintiff was in charge of all hotel employees.  Id.  She also had financial responsibilities, which

included overseeing daily deposits and updating Landmark's accounting system to reflect the

current status of hotel revenue.  Id.  Additionally, she was in charge of managing accounts

receivable (i.e., significant outstanding debts owed to the properties by customers) and collecting

on those accounts as quickly as possible.  Id.  In order to perform her job responsibilities,

Plaintiff had access to bookkeeping records, safes, profits and losses statements, and electronic

customer accounts.  Id.; see Jan. 16, 2013, Plaintiff's Deposition Transcript ("Pl. Dep."),

attached as Ex. 5, at 265.

3.      By 1995, Plaintiff had become a part owner of her first Landmark hotel.  Compl.

¶ 19.  As a part owner, Plaintiff invested and purchased interest in acquired hotels and property.

Id. ¶ 20.  Raj Jain, Landmark's now Chairman and Founder, personally financed Plaintiff's initial

ten percent buy in, until she was able to repay him.  Declaration ¶ 4.

4.      Both before and after she became a part owner of various Landmark hotels,

Plaintiff and Mr. Jain spent significant amounts of time together as Mr. Jain taught Plaintiff

about the hotel business.  Declaration ¶ 5.  Plaintiff considered Mr. Jain her mentor.  See Pharr

Ex. 2 to Pl. Dep., attached as Ex. 6.  Sometime in 1995, Plaintiff and Mr. Jain began having a

consensual, sexual relationship when Plaintiff was married to her first husband, Preston Sears.

5

Compl. ¶ 16; Pl. Dep. 47.  The sexual relationship lasted until 1997 or 1998 when Plaintiff became involved with her current husband, David Pharr.  Pl. Dep. 47-48.  Plaintiff was in love with Mr. Jain.  Pl. Dep. 67.

5.       Plaintiff married Mr. Pharr in 1999.  Compl. ¶ 54.  Plaintiff invited Mr. Jain and his wife to attend her intimate, church wedding.  Id.  Plaintiff asked Mr. Jain to "stand up" for her during the ceremony.  Pl. Dep. 110-111.  Mr. Jain accepted and stood alongside Plaintiff and her brother at the altar.  Id. 110-111.  Plaintiff described the event as a "very sweet wedding. With our family and friends."  Id. 115.

6.       Beginning in 2001, Plaintiff received additional investment opportunities in various Landmark properties.  Declaration ¶ 6.  When Plaintiff did not have the capital to pay for the investments, Mr. Jain would make financing arrangements for her.  Id. ¶ 4.

7.       In 2006, because of the favorable credit market, Landmark refinanced all of its properties.  Id. ¶ 6.  Plaintiff received $1.6 million from distributions and financing.  Pl. Dep. 91. She and the other investors were advised that they would be responsible for any future calls for capital needed to sustain and maintain the business.  Declaration ¶¶ 4, 6.

8.       Between 2007 and 2009, Landmark initiated a number of projects and offered Plaintiff the opportunity to invest.  See id. ¶ 6.  During the same period, Plaintiff borrowed $85,000 from Mr. Rahil, Landmark's Vice President of Operations and sold him some of her equitable interest in Landmark properties.  Pl. Dep. 140-141.  Plaintiff also made several personal investments unrelated to Landmark.  See Pl. Dep. 10.

9.       By 2007 Plaintiff was appointed Vice President of Operations to oversee both North Carolina properties.  Declaration ¶ 8.  She continued to work as General Manager of Comfort Inn North even after her appointment.  Id.  In July 2008, Plaintiff fired the General

Manager for Comfort Inn South and assumed the role of General Manager at the property.  <u>Id.</u> ¶ 9.  As General Manager for both Comfort Inns North and South, Plaintiff had full control over their operations, their personnel, and their finances.  <u>Id.</u> ¶ 7.

10.     In early 2009, the balance sheets for both North Carolina properties (Comfort Inns North and South) showed larger-than-normal accounts receivable.  <u>Id.</u> ¶ 11.  Mr. Jain, upon discovering the issue, brought it to Plaintiff's attention.  <u>Id.</u>  Plaintiff promised that she would resolve the issue.  <u>Id.</u>  She assured Mr. Jain that there was no reason for alarm, and all the debts were recoverable.  <u>Id.</u>  When Mr. Jain followed up with Plaintiff later that year, she assured Mr. Jain that she had the matter under control.  <u>Id.</u>  Based on this assurance, Mr. Jain did not pursue the matter further.  <u>Id.</u>  Plaintiff was personally invested in the hotels' welfare.  <u>Id.</u>  She was a part owner of various Landmark properties, a longtime employee, and a General Manager, and Mr. Jain trusted that she was competent and motivated to collect.  <u>Id.</u>

11.     In March 2010, while preparing Landmark's taxes for fiscal year 2009, Mr. Jain discovered that the accounts receivable had swelled to over $100,000 for each of the properties Plaintiff managed.  Declaration ¶ 12.  Mr. Jain contacted Plaintiff and demanded an explanation.  <u>Id.</u>  Plaintiff stated that she would get back to him with an explanation once she reviewed the books.  <u>Id.</u>

12.     Also in March 2010, both of the North Carolina properties' bank accounts had insufficient funds.  <u>See</u> Pharr Ex. 14 to Pl. Dep., attached as Ex. 7.  This was because Plaintiff failed to timely deposit monies to cover checks written on the accounts.  <u>Id.</u>  Darla Tison, Landmark's Comptroller, had to bring the matter to Plaintiff's attention on more than one occasion, first noting a returned check in the amount of $40,000, then informing Plaintiff that it appeared the same account would be overdrawn again, and finally asking "Why are you writing

checks with no money in the account[?]"  <u>See</u> Pharr Ex. 15 to Pl. Dep., attached as Ex. 8; <u>see also</u> Ex. 7.

13.     By July 2010 the total uncollected receipts for both properties remained well over $300,000, but Plaintiff still could not account for the deficit.  Declaration ¶ 14.  Mr. Jain asked Plaintiff for information on each individual account and stated that he was "most willing to help out."  Pharr Ex. 20 of Pl. Dep., attached as Ex. 9.  After this point, however, Mr. Jain believed that he did not understand the full scope of the accounts receivable, and he turned the matter over to Mr. Rahil to investigate.  Declaration ¶ 15.

14.     Mr. Rahil made repeated attempts to schedule a visit to the two North Carolina properties to review their books.  Declaration ¶ 17.  Plaintiff finally scheduled a meeting for July 15, 2010 with Mr. Rahil and Ms. Tison.  <u>See</u> Pharr Ex. 21 of Pl. Dep., attached as Ex. 10.  Mr. Rahil asked that, in anticipation of their visit, Plaintiff prepare all invoices related to the accounts receivable as well as deposit logs and deposit tickets.   <u>Id.</u>  He provided a detailed list of all relevant information he would need to review.  <u>Id.</u>

15.     On July 14, 2010, Plaintiff sent an email to Mr. Jain, in which she stated that he had "lost faith" in her.  Ex. 1; <u>see</u> Pl. Dep. 73-76.  In her attached letter, she noted that Mr. Jain had "been pulling away now for some time."  <u>Id.</u>  She said that they could both "move on," but first she wanted him to pay her $2.5 million, tax-free, and in turn she would not sue for "any reason such as sexual harassment and or sex discrimination"  <u>Id.</u>  Plaintiff also told Mr. Jain to "[c]all off Mr. Rahil and Darla."  <u>Id.</u>  Plaintiff ended the email by stating that she and Mr. Jain had "had a great journey together."  <u>Id.</u>

16.     On September 21, 2010, Ms. Tison contacted Plaintiff because Plaintiff was not providing deposit information for Comfort Inns North and South on a timely basis.  Pharr Ex. 28

8

to Pl. Dep., attached as Ex. 11.  Mr. Jain followed up a week later.  Pharr Ex. 29 to Pl. Dep.,

attached as Ex. 12.   Mr. Jain asked Plaintiff if deposits were current and whether any past due

accounts had been collected.  Id.  Mr. Jain sent another email on Monday, October 11, 2010

asking for an update.  Pharr Ex. 30 to Pl. Dep., attached as Ex. 13.  Plaintiff responded that she

would be caught up by Thursday.  Id.

17.     On October 25, 2010, Mr. Jain again emailed Plaintiff because Ms. Tison

informed him that Plaintiff was not current with her entries into Landmark's accounting

program, M-3.  Pharr Ex. 33 to Pl. Dep., attached as Ex. 14.  Mr. Jain again asked for Plaintiff's

help to resolve the issue.  Id.

18.     In early November 2010, Ms. Tison emailed Plaintiff because bank statements for

Comfort Inns North and South showed only a few cash deposits for August and September.

Pharr Exs. 34 & 35 of Pl. Dep., attached as Ex. 15.  It was the practice at Landmark to make

daily cash deposits, but Plaintiff did not adhere to that practice.  Id.; Pl. Dep. 201.  Instead of

depositing the cash at the bank, she took cash home with her.  Pl. Dep. 202:3-10.  Plaintiff

admitted in her deposition that she had approximately $100,000 in cash from the two hotels at

her house.  Pl. Dep. 232.

19.     On November 10, 2010, Mr. Jain instructed Plaintiff to "resolve deposit issues

ASAP."  Pharr Ex. 39 to Pl. Dep., attached as Ex. 16.  He also directed Plaintiff to "keep deposits

and M-3 current going forward and catch-up on the past."  Id.

20.     The next day Mr. Jain emailed Plaintiff stating that the cash shortages for both

properties totaled $101,168.00.  Pharr Ex. 40 to Pl. Dep., attached as Ex. 17.

21.     Less than a week later, on November 16 & 17, 2010, Plaintiff deposited over

$100,000.00 into Landmark accounts.  See Pharr Ex. 60 to Pl. Dep., attached as Ex. 18.  The

deposits were not in cash.  Id.  Rather, Plaintiff wrote numerous personal checks, totaling $102,522.62.  Id.

22.    Mr. Akhil Jain and Mr. Rahil discovered the personal deposits in late November, and they requested the deposit checks from the bank.  Declaration ¶ 21.  They were suspicious that at least two months' worth of deposits by personal checks were made over the course of only two days.  Id.

23.    By this time, Mr. Rahil's investigation of accounts receivable, had already uncovered evidence of financial improprieties.  Declaration ¶ 18. The personal checks added even more support.  Id.  By the end of the investigation, Landmark discovered that some accounts receivable were false, and others appeared to be manipulated because they showed monies due even though the accounts had been paid in full.  Id. ¶ 18. Landmark ultimately concluded that Plaintiff had created the fiction of large accounts receivable to cover up the cash that she was taking from the hotels on a regular basis.  Id. ¶ 24.

24.    For example, Landmark learned that in May 2009, an adjustment was made to the account for John Holbrook Tours to reflect unpaid monies.  See Pharr Ex. 61 to Pl. Dep., attached as Ex. 19.  Although the account was paid by check on May 1, 2009, in the amount of $13,868.54, on May 30, 2009 the account was manipulated to reflect a balance due of $12,357.98.  Id.

25.    Landmark also discovered that on December 31, 2009, an accounts receivable account was created for "Travel Net Reservation."  Id.  The account was assigned to Plaintiff's given name and actually included Plaintiff's home address, but Landmark has no knowledge of any entity named "Travel Net Reservations."  Id.; Declaration ¶ 18.

26.     Landmark further uncovered that on April 18, 2010, several changes were made to various accounts receivable: Travel Net Reservations, Waff Contracting, Wimco General Contractors (#1), Wimco General Contractors (#2), Carolina Tour, and Educatours.  Ex. 19. Despite the fact that the accounts for some of these companies reflected stays in 2009 and the others reflected no stays at all, each of the accounts displayed refunds that far exceeded the initial charges.  Id.  For example, the initial charges for Wimco General Contractors (#2) totaled $375.44 (four nights at $83.99/night plus applicable tax), but on April 18, 2010 the account was manipulated to reflect a refund in the amount of $22,341.99—nearly **60 times** the original charge—without any notation in the Comment section to explain the action.  Id.

27.     Landmark also learned that in May 2010 an invoice in the amount of $13,529.48 was created for Holmes Middle School located at 615 Summit Lake Drive, Kill Devil Hills, North Carolina.  Id.  The street address listed on the account was the same as the address listed on another account for a different client, John Holbrook Tours.  Id.  However, there was never a "Holmes Middle School" in Kill Devil Hills, and there was never a "Summit Lake Drive" in the town.

28.     None of the refunds reflected on the various accounts were actually issued to any clients, however.  Declaration of Mr. Jain, at ¶ 18.  Plaintiff lacked the authority to do so.  Id.; Pl. Dep. 307.  Refund checks must be approved by and sent from Landmark's main office in Virginia Beach.  Pl. Dep. 307.

29.     When Landmark contacted Harris Teeter regarding an accounts receivable of $20,835.68, Harris Teeter produced checks showing that it had satisfied the debt years earlier. Declaration ¶ 24.  Although the bills were paid, Plaintiff left the debts on the books.  Id.

30.    Also during that investigation, Landmark discovered that in late November 2008 over $43,000 was deposited into the bank accounts for Comfort Inns North and South in the form of cashier's checks.  Pl. Dep. 258-263.  At the time of the deposit a bank teller for RBC Centura called Landmark to report that a hotel representative was depositing cashier's checks in lieu of cash or personal checks from hotel customers.  Id. 261.  In her deposition, Plaintiff testified that she was aware of the suspicious activity but that she could not think of a legitimate reason why someone would deposit cashier's checks when cash deposits would have sufficed.  Id. 258-263.

31.    Cash income for each hotel is approximately ten percent of the hotel's annual business, so the cash to which Plaintiff had access annually for both North Carolina properties combined was approximately $500,000.  Declaration ¶ 20.

32.    All of the adjustments, refunds, deposits, and debts allowed the books to appear balanced through accounts receivable even though money was missing.  Id. ¶ 24.  Plaintiff insisted that those accounts were collectible, but it appeared that no amounts were actually due. Id.  The money was simply gone.  Id.  Mr. Jain had previously given Plaintiff the benefit of the doubt, but by December 2010 he had lost confidence in her.  Id. ¶ 22.

33.    On December 13, 2010, Plaintiff was removed as General Manager of the North Carolina operations and was assigned the sole responsibility to collect the accounts receivable for the two hotels.  Id. ¶ 23.

34.    On December 15, 2010 Mr. Jain sent an email to Plaintiff informing her that Mr. Rahil would meet with her at the Comfort Inn North the following day to address the still deficient accounts.  See Pharr Ex. 45 to Pl. Dep., attached as Ex. 20.

35.    That night, just hours after receiving confirmation that Mr. Rahil would personally review accounts receivables, Plaintiff sent an email to Mr. Jain telling him that she

believed that she, up to that point, "had done well maintaining separation with personal and professional." Ex. 2.  She mentioned that Mr. Jain "wanted [her] to be honest with [her husband]," but she did not know "exactly what parts of the truth" she was supposed to tell him. Id.  She claimed that she "did everything thinking [Mr. Jain] was looking out for [her]." Id. Plaintiff stated that she "could have looked at Akhil on Monday and told him [she had] been involved sexually with [his dad] for the last 20 years." Id.  She concluded, "That is the truth." Id.

36.     Plaintiff maintained an intimate relationship with Mr. Jain even after she married Mr. Pharr.  Id.

37.     Over the course of their relationship, Plaintiff and Mr. Jain exchanged emails on personal matters and were often involved in each other's personal and family affairs.  See, e.g., Pharr Ex. 55 to Pl. Dep., attached as Ex. 21.

38.     Plaintiff asked Mr. Jain to stand with her at the altar alongside her and her brother at her wedding.  Pl. Dep. 110-111.

39.     A few years later, Plaintiff took two weeks off from work and personally paid for her and her husband's trip to Mr. Akhil Jain's wedding in India.  Pl. Dep. 129; 275-276.

40.     Plaintiff often brought her children to events with Mr. Jain's family, capturing those moments with pictures.  See, e.g., Pl. Dep. 274.  Plaintiff frequently sent these pictures and others to Mr. Jain.  Ex. 21.

41.     On December 22, 2010, Plaintiff's attorney first contacted Mr. Jain to inform him that Plaintiff wished to withdraw her membership of various Landmark hotels.  Declaration ¶ 25.

42.     Plaintiff's employment with Landmark was officially terminated on December 23, 2010.  Id.  The three remaining Landmark owners, Mr. Jain, Mr. Akhil Jain, and Mr. Rahil, made

the decision based on her desire to part ways as well as the mounting evidence of Plaintiff's financial improprieties and embezzlement.  Id.

43.     On January 15, 2011, Plaintiff re-sent Mr. Jain her July 14, 2010 email in which she told Mr. Jain that he was "pulling away from [her]," that he had "lost faith" in her, and that they had "had a great journey together."  Pharr Ex. 4 of Pl. Dep., attached as Ex. 22.  In that email she also requested $2.5 million in exchange for the promise not to sue for "any reason such as sexual harassment and or sex discrimination."  Id.  Mr. Jain refused to pay Plaintiff the $2.5 million requested.  See id.

44.     Plaintiff is currently under investigation by the North Carolina State Bureau of Investigations for embezzlement of company funds during her employment at Comfort Inns North and South.  See Declaration ¶ 26.

## ARGUMENT

## I.     STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party can satisfy its burden of showing the absence of a genuine issue of material fact by delineating the absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Thus, in order to avoid summary dismissal of her claims, Plaintiff must produce evidence establishing every element on which she will bear the burden of proof at trial.  Id. at 322-23; Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 216 (4th Cir. 1987).  "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of [her] claim at trial."  Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

14

"Unsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  Nor is it sufficient for the plaintiff to "[rest] upon the bald assertions of her pleadings." Id.  Conclusory statements, unsupported assertions, and "self serving opinions without objective corroboration" are not sufficiently probative to survive summary judgment.  Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

## II.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF SEXUAL HARASSMENT

Under Title VII, a cause of action may exist if "sexual harassment creates a hostile work environment or abusive atmosphere." Smith v. First Union Nat'l Bank, 202 F.3d 234, 241 (4th Cir. 2000).  To establish sexual harassment, a plaintiff must prove the following four elements: "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Ocheltree v. Scollon Prods., Inc., 308 F.3d 351, 356 (4th Cir. 2002) (citation omitted).  The correct inquiry for the first element is "whether [the employee] by her conduct indicated that the alleged sexual advances were unwelcome . . . ." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 68 (1986).  It is the "plaintiff's response to the advances [that] provides evidence of unwelcomeness." Briggs v. Waters, 484 F. Supp. 2d 466, 478 (E.D. Va. 2007) (citations omitted).

### A.    Plaintiff's Conduct Cannot Support her Allegation that the Sexual Advances were Unwelcome

#### 1.    Plaintiff and Mr. Jain Had a Consensual Sexual Relationship.

Plaintiff alleges that Landmark "subjected her to sexual harassment, a hostile work environment and retaliation during the course of her employment beginning on or about 1992."

15

Compl. ¶ 2.  However, as admitted in her deposition, Plaintiff and Mr. Jain engaged in a consensual sexual relationship with varying frequency starting in 1995.  Plaintiff also testified that Mr. Jain had convinced her that he loved her and that in 1996 she told Mr. Jain that she loved him.  Pl. Dep. 48, 67.

In 1998, when Plaintiff began dating her now husband, David Pharr, Plaintiff alleges that Mr. Jain "became insanely mad" and claimed that she was cheating on him.  Compl. ¶ 38.  She also alleges that "in retaliation, [Mr. Jain] stripped [Plaintiff] of her partnership interest in the Country Inn and Suites."  Id. ¶ 40.  Plaintiff further contends that Mr. Jain made arrangements to "meet the Plaintiff for a sexual encounter" in March 1999, when Plaintiff was five months pregnant, and that she "spent the entire day crying and completely distressed."  Id. ¶¶ 47-51.

Yet, despite this alleged harassment, Plaintiff not only invited Mr. Jain to her wedding just two months later, in May 1999, but she also asked him to stand at the altar with her alongside her brother.  See Pl. Dep. 110-111.  Plaintiff described the event as "a very sweet wedding.  With our family and friends."  Pl. Dep. 115.

## 2.      Plaintiff's Conduct From 2008 until 2010 Undermines Her Allegation that She was Subjected to Unwelcome Sexual Advances

Plaintiff contends that the years of 2008, 2009, and 2010 were marked by serious, aggressive behavior.  See Ex. 6.  She alleges that Mr. Jain would "walk up from behind her and run his hand down her shirt" and "grab [Plaintiff's] breasts and squeeze very hard."  Compl. ¶ 68.  Plaintiff also contends that Mr. Jain would vulgarly proposition her during events and that "he would get a thrill out of attacking Ms. Pharr and grabbing her."  Id. ¶ 73-75.

Yet, despite these allegations of crude and offensive behavior, Plaintiff initiated and maintained significant contact with Mr. Jain and his family throughout the 2008, 2009, and 2010

timeframe that is inconsistent with an individual alleging that she was subjected to unwelcomed

sexual contact:

- **April 2008**: Plaintiff took pictures of Mr. Jain's personal furniture that she assumed as her own office furniture in Comfort Inn South.  Ex. 21.

- **May 2008**: Plaintiff attended a baby shower for Mr. Jain's daughter in law. Plaintiff brought her daughter with her and both posed for pictures with Mr. Jain. Id.; Pl. Dep. 269.

- **July 2008**: Plaintiff sent Mr. Jain pictures of her children while on the vacation. Ex. 21; Pl. Dep. 272.

- **November 2008**: Plaintiff emailed Mr. Jain pictures of her children dressed up for Halloween.  In her email, Plaintiff exclaimed, "Thought you would enjoy this!" Ex. 21; Pl. Dep. 275.

- **July 2009**: Plaintiff emailed pictures from Mr. Jain's grandson's first birthday. She and her two children attended.  Ex. 21; Pl. Dep. 274.

- **April 2010**: Plaintiff emailed Mr. Jain a picture of her daughter showing off an Indian garment.  Ex. 21; Pl. Dep. 273-274.

- **April 2010**: Plaintiff emailed Mr. Jain asking, "Does Mrs. Jain know how to fix Corn Chiwra?" Pharr Ex. 16 to Pl. Dep., attached as Ex. 23.

- **April 2010**: Plaintiff emailed Mr. Jain suggesting that he purchase a hybrid automobile.  Pharr Ex. 17 to Pl. Dep., attached as Ex. 24.

- **May 2010**: Plaintiff emailed Mr. Jain a picture of him and Mrs. Jain with the caption: "You guys are getting younger looking every year." Ex. 21; Pl. Dep. 276-277.

- **May 2010**: On May 13, 2010, at 3:37 a.m., Plaintiff forwarded Mr. Jain a link to a house she wanted to buy in the Outer Banks with the caption: "Be nice to live here next year!"  Pharr Ex. 18 to Pl. Dep., attached as Ex. 25; Pl. Dep. 165-166.

Additionally, in preparation for a meeting on June 29, 2010, Plaintiff drafted a document with a

brief description for each of Landmark's corporate members.  Plaintiff described Mr. Jain as the

"[w]hole package" and the "smartest bussiness [sic] man and great human being . . . The reason

we have done so well and why we are here." Pharr Ex. 58 to Pl. Dep., attached as Ex. 26.  This

is clearly not the description of a sexual harasser.

On July 14, 2010, just two weeks after the above referenced meeting, Plaintiff sent an

email to Mr. Jain.  In this email, she stated: "You have lost faith in me.  I don't have it anymore

to keep fighting all the fights."  Plaintiff also attached a letter to Mr. Jain to this email.  In the

letter she stated:

> **You have been pulling away now for some time. . I will move on with my family and you with yours.**  You can go on living a clean life.
>
> Akhil needs new people at the top.  I nor Rahil are the ones to take him where he wants to go.  Let me be the first to go and the beginning of his re-organization.
>
> **I am playing the sweat [sic] heart card.  It's time to divorce**
>
> We have been together for over 20 years.  The following is not just based on business values but personal relationship as well.  I have given you all I can and have.
>
> This is my settlement terms:
>
> I want 2.5 million net (after taxes and any reorganization fees related to dissolving me from the company) Don't know what that is, you do the math.  You've given to Akhil, And Mr. Rahil.  I don't think they earned what they have either.  I want a good life too.
>
> I want 1 million by August 15th.  The rest can be worked out in agreeable terms.
>
> We can draw up legal documents, I will agree not to sue you or [Landmark] for any reason such as sexual harassment and or sexual discrimination.
>
> Call off Mr. Rahil and Darla
>
> I want till October 1st to get my house in order
>
> **We have had a great journey together.**
>
> Michelle

Ex. 1 (emphasis added).

Plaintiff alleges that the following day, July 15, 2010, Mr. Jain visited her in North

Carolina, claimed he could not live without her and sexually assaulted her.  Compl. ¶ 24; Ex. 6.

Ms. Pharr alleges that she was "horrified" and "left the room."  Compl. ¶ 84.

18

Plaintiff's conduct after the alleged July 15, 2010 encounter is entirely contrary to the actions of individual alleging that she was subjected to unwelcomed sexual contact.  Just a week later, on July 22, 2010, Plaintiff sent Mr. Jain an email that said "Day 2 of my diet pills complete.  Side-effect – makes you moody. . . not good."  Pharr Ex. 24 to Pl. Dep., attached as Ex. 27.  During her deposition, Plaintiff had no explanation for why she sent this playful email to her alleged harasser about a matter wholly unrelated to business just a week after alleged sexual harassment.  Pl. Dep. 183-186.  In fall 2010, Plaintiff emailed Mr. Jain pictures of her North Carolina properties and the courtroom celebration of her legal victory in her property dispute.  Ex. 21.  In late October 2010, Plaintiff emailed Mr. Jain pictures of herself and her daughter spending time with Mrs. Jain and their grandson at the Jain residence.  Id.  On November 6, 2010, Plaintiff sent Mr. Jain an email that read "Are you ignoring me.  Just let me know if you are, I will stop contacting you."  Pharr Ex. 37 to Pl. Dep., attached as Ex. 28.  On December 3, 2010, Plaintiff emailed Mr. Jain, telling him about her grandmother and joking about how she enjoyed staying overnight in the hospital.  See Pharr Ex. 44 to Pl. Dep., attached as Ex. 29.  Plaintiff continually sought Mr. Jain's attention.  Then, on December 15, 2010, Plaintiff sent another email to Mr. Jain, which stated, in part,

> You wanted me to be honest with David, but exactly what parts of the truth am I suppose [sic] to tell him.  Do I tell him just enough so he's disappointed in me, kind of like every one else, or tell him the complete truth . . . .  Yes, I could have looked at Akhil on Monday and told him I have been involved sexually with your dad for the last 20 years and here I am beaten up and worn out failing to separate personal and professional.  That is the truth.

Ex. 2.

Landmark discharged Plaintiff on December 23, 2010, following an investigation that revealed substantial evidence that Plaintiff embezzled over $400,000 in company funds during her employment with Landmark.  On January 15, 2011, Plaintiff resent her July 14, 2010 email,

reaffirming its content and reasserting her demand for $2.5 million in exchange for an agreement not to sue.

Mr. Jain refused to submit to Plaintiff's attempts at extortion.  He once trusted Plaintiff when she insisted that she had everything under control and that all uncollected monies were recoverable.  After all, she was a part owner in various Landmark hotels and a twenty year employee at two of those hotels.  However, after months of suspicious account activity, late deposits, and payments through Plaintiff's personal checks, Mr. Jain could not ignore his responsibilities as Chairman and Founder of Landmark.  As officers and owners, Mr. Jain, Mr. Akhil Jain, and Mr. Rahil could no longer allow Plaintiff to serve as an employee of Landmark. Consequently, they terminated her employment.

### B.      Plaintiff Cannot Cry Foul

The Fourth Circuit has made clear that an employee cannot "fully participate in, and even enjoy" conduct, but then later "cry 'foul'" that the conduct was, at the time, unwelcome.  See Hartsell v. Duplex Products, Inc., 123 F.3d 766, 776 n.7 (4th Cir. 1997).  Plaintiff has attempted to do just that.

Plaintiff admits that she had a long-term, consensual relationship with and Mr. Jain. Plaintiff made no attempt to complain to other owners of Landmark or distance herself from her alleged harasser.  Rather, Plaintiff and her family would often interact with the Jain family, and Plaintiff would solicit attention and advice from Mr. Jain on personal matters, wholly unrelated to her professional responsibilities.

Only when Mr. Jain became more demanding of answers regarding the accounts receivables did Plaintiff "cry foul."  In fact, in the same letter that Plaintiff makes her "complaint," she tells Mr. Jain to "call off Mr. Rahil and Darla."  Both individuals were scheduled to visit Plaintiff's hotels in an effort to discern the source of missing corporate funds

and uncollected accounts receivable. Plaintiff was, to that point, unable to account for or explain why the financial records for Comforts Inn North and South reflected such low revenue or why accounts receivable reflected such large debts. Mr. Rahil was close to uncovering Plaintiff's misdeeds, and she was cornered.

## III.   PLAINTIFF CANNOT ALLEGE SEX DISCRIMINATION BASED ON UNEQUAL PAY

To the extent that Plaintiff alleges that she was treated differently than other LLC members who are part owners of Landmark properties, she cannot establish a claim for discrimination. Plaintiff cannot establish a prima facie case based on her allegations that she received different pay, because she, in fact, received paychecks when Mr. Jain, Akhil Jain, and Mr. Rahil did not.

First, although Plaintiff attempts to compare herself with Mr. Rahil, he is not a proper comparator. Aside from the vastly different credentials, each held different titles with different responsibilities to Landmark. See Compl. ¶ 18. While Plaintiff was a Vice President of and employee at **two** Landmark properties, Mr. Rahil was (and still is) Vice President of **all** of Landmark's Operations. Furthermore, Plaintiff received an annual salary during the same timeframe that Mr. Rahil (and other Landmark owners) received none. Beginning in August 2009, Mr. Jain, Akhil Jain, and Mr. Rahil stopped receiving salaries. However, Plaintiff was paid her entire annual salary of $60,000 until her termination in December 2010. During the time that Plaintiff collected approximately $83,500 in salary compensation, Mr. Rahil and the other owners collected $0. In fact, they did not resume salary compensation for ten months after Plaintiff's termination. Declaration ¶ 10. Contrary to her allegations, Plaintiff was, in fact, treated more favorably than Landmark's other owners. Thus, Plaintiff cannot prove that she

occupied a similar job to a higher paying job occupied by a male.  <u>Lovell v. BBNT Solutions,</u>

<u>LLC</u>, 295 F. Supp. 2d, 611, 624-25 (E.D. Va. 2003)

## IV.    **PLAINTIFF CANNOT ALLEGE A PRIMA FACIE CASE OF RETALIATION**

Title VII prohibits an employer from retaliating against employees for their "opposition

to, or complaint about, un unlawful employment practice." 42 U.S.C. § 2000e-3(a).  When, as

where, there is no direct evidence of intentional discrimination or retaliation, the employee has

the initial burden of proving a prima facie case of discrimination by a preponderance of the

evidence.  <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002) (citing

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).  If the employee can establish a

prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory

explanation for the employment action.  <u>Id.</u>  If the employer meets this burden of production, the

employee must show that the employer's asserted reason is pretextual.  <u>Id.</u>

To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in

protected activity; (2) her employer acted adversely against her; and (3) the protected activity

was causally connected to the adverse action.  <u>See</u> <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d

208, 218 (4th Cir. 2007).  Fatal to her claim is that Plaintiff cannot establish any protected

activity that is causally connected to any adverse action.

### A.    **Plaintiff's Allegedly Protected Activity**

Plaintiff alleges that she first complained about sexual harassment on July 14, 2010.  <u>See</u>

Pl. Dep. 43.  However, despite her allegations, Plaintiff never complained to anyone at

Landmark about any of the specifically alleged incidents of harassment.  Landmark's Complaint

Procedure provides that if "unwelcome behavior involves a manger [sic] or supervisor to whom

[an employee] directly or indirectly report[s], [the employee] can also seek help from any other

manager."  Pharr Ex. 59 to Pl. Dep., attached as Ex. 30.  Plaintiff acknowledged that she "could

have" reported sexual harassment to any other manager in the organization.  Pl. Dep. 283.  If

Plaintiff utilized the company Complaint Procedure she could have addressed her complaint with

Mr. Akhil Jain.  If she felt this was a conflict of interest, Plaintiff could have sought redress from

Mr. Rahil who Plaintiff believed to be a "trustworthy person."  See Pl. Dep. 211.

     Furthermore, the EEOC has advised that in situations in which there is an indication of

welcomeness, the Plaintiff's claim "will be considerably strengthened if she made a

contemporaneous complaint or protest.  Particularly when the alleged harasser may have some

reason (e.g., prior consensual relationship) to believe the advances will be welcomed, it is

important for the victim to communicate that the conduct is unwelcome."  EEOC Policy

Guidance on Current Issues of Sexual Harassment, No. N-915-050 (Mar. 19, 1990).  Yet,

Plaintiff admits that her first "complaint" did not occur until July 14, 2010 – years after she

claims the harassment began.  Even then, she phrased her "complaint" as follows:

> **You have been pulling away for some time** . . . . I want 2.5 million net . . .
> .You've given to Akhil and Mr. Rahil.  I don't think they earned what they have
> either.  I want a good life too. . . . We can draw up legal documents, I will agree
> not to sue you or Landmark for any reason such as sexual harassment and or
> sexual discrimination . . . . **We have had a great journey together.**

Ex. 1 (emphasis added).  This is a request for $2.5 million, not a complaint of sexual harassment.

To suggest that this email constitutes "protected activity" offends the fundamental purpose of

Title VII, and no reasonable jury could conclude that this was a legitimate attempt to seek

protection from Title VII.

    **B.**    **<u>Plaintiff Cannot Show that Landmark Took Any Adverse Employment
Action Other Than Her Termination</u>**

     Plaintiff alleges that Landmark retaliated against her by (1) manufacturing appraisals of

her membership share in a diminished value; (2) deliberately withholding distributions; (3)

deliberately trying to bankrupt her and "starving her out" through foreclosure; (4) creating a

hostile work environment; (5) fabricating lies; and (6) failing to investigate.  However, Plaintiff has no evidence of any of the aforementioned accusations.

### 1.        Manufacturing Appraisals in a Diminished Value

Plaintiff specifically alleges that her share of the hotel properties were fraudulently appraised.  Pl. Dep. 37-38.  However, Plaintiff had a choice of three appraisers, and her attorney chose the appraiser she now challenges.  Id. 38.

### 2.        Deliberately Withholding Distributions

Landmark did not issue distributions to its owners for the years of 2010, 2011, and 2012.  Pl. Dep. 39.  This decision was made to preserve the company, recover from poor economic times, and recoup losses from missing accounts receivable funds.  See Declaration ¶ 10.

Further, in 2010, while all of the owners did not receive distributions, only Plaintiff—not Mr. Jain, nor Mr. Akhil Jain, nor Mr. Rahil—received a salary.  Pl. Dep. 155.  In this respect, Plaintiff was treated **more favorably** than the other owners.

### 3.        Deliberately Trying to Bankrupt Plaintiff and "Starving Her Out"

An LLC cannot make a distribution if after such distribution, the LLC would not be able to pay its debts.  Va. Limited Liability Co. Act. § 13.1-1035.  Landmark's hotels were mortgaged to the hilt, and after the recession, it could not make distributions.  As mentioned above, Plaintiff received compensation at times when other owners did not.  She received over $1,000,000 in distributions even after accounting for her investments in the properties.  The fact that Plaintiff had outside investments that cost her more money than she may have anticipated does not reflect an obligation on the part of Landmark to pay her a distribution to carry those costs.

I-1147310.4

### 4. Creating a Hostile Work Environment

As explained in Section II, Plaintiff cannot prove that she was subject to a hostile work environment because her conduct was entirely contrary to that of a victim alleging unwanted advances.

### 5. Fabricating Lies

In her deposition, Plaintiff could not point to a single lie that Landmark fabricated.  <u>See</u> Pl. Dep. 42.

### 6. Failing to Investigate

Plaintiff cannot prove that Landmark "failed to take a proper investigation."  Pl. Dep. 43. Landmark had undergone a lengthy and thorough investigation of all of the factual circumstances surrounding Plaintiff's termination.  Declaration ¶¶18-24.

### C. <u>Plaintiff Cannot Prove that Her Conduct is Causally Connected to Any Adverse Employment Action</u>

Plaintiff cannot establish that her conduct is causally connected to any adverse action, including termination.  In the same email referenced above, Plaintiff indicated her desire to end her relationship with Mr. Jain and Landmark.  Landmark removed Plaintiff from the General Manager positions when it discovered that she was mishandling money and manipulating the accounts receivable in a manner that suggested that she was embezzling funds from the company.  Plaintiff requested to withdraw as a member of various Landmark hotels a week later. Landmark ultimately terminated her employment when it amassed evidence suggesting that Plaintiff was responsible for serious financial improprieties, including embezzlement.  In fact, Plaintiff is being investigated by the North Carolina State Bureau of Investigations for the criminal activity.  There is no evidence to suggest that these actions were in any way related to

any alleged "protected activity" by Plaintiff, and no reasonable jury could conclude that her July 14, 2010 email was causally connected to any adverse employment action.

## V.     LANDMARK HAS ARTICULATED LEGITIMATE NON-DISCRIMINATORY REASON FOR PLAINTIFF'S DISCHARGE

Landmark has articulated legitimate, non-discriminatory reasons why she (1) was removed from the General Manager positions and (2) left the membership.

As previously stated, Landmark removed Plaintiff from her responsibilities as General Manger when it discovered that she was mishandling hotel money.  First, Plaintiff admits that she took at least $100,000 home with her, in contravention of Landmark's practice requiring daily cash deposits into the appropriate bank accounts.  This, alone, is grounds for termination.

Second, she admits that by taking cash home with her, Plaintiff fell behind on cash deposits for the North Carolina hotels' most lucrative months.  Third, Plaintiff acknowledges that she had access to customer accounts where many adjustments and refunds were recorded weeks, months, and even a year after the clients' stays at the hotels.  Many of these changes created accounts receivable that far exceeded the clients' initial charges or assigned debts to clients that did not exist.  Plaintiff used the accounts receivable to create fictitious clients and false charges to hide the hotels' cash shortages in the hotels' checking accounts so that the books appeared to be balanced.  See Ex. A to Declaration of Raj Jain, attached as Ex. 3.

Plaintiff acknowledges that she was responsible for the hotels' finances and collections. See Pl. Dep. 145; 159-160.  Plaintiff could have been terminated for any of the above stated actions, and, in the aggregate, they constitute extremely serious violations of company protocol and even suggest criminal conduct.  Landmark could not allow Plaintiff to remain in a position where she had access to hotel funds, the ability to access client accounts, and the authority to

I-1147310.4

manipulate the books.  Accordingly, it removed her from this position.  This decision had no

relation to Plaintiff's physical relationship with Mr. Jain.

As for Plaintiff's departure from Landmark, Plaintiff's then attorney, Lars Simonsen,

contacted Mr. Jain in December 2010 and stated that Plaintiff wished to leave the company.  In

an email dated January 13, 2011, Mr. Simonsen clearly stated that it was Plaintiff's "desire to

withdraw as a member of the various Landmark Hotel Group LLCs."  Email from Lars Simonsen

to Mr. Jain, See Ex. B to Declaration of Raj Jain, attached as Ex. 3.  Because Plaintiff requested

to leave the membership, she cannot allege that she was discharged in retaliation for the July 14,

2010 email.

Because Landmark has articulated legitimate, non-discriminatory reasons for removing

Plaintiff from the General Manager positions and for her withdrawal from Landmark, and

because Plaintiff has no evidence of pretext, she cannot establish a claim for retaliation.

## VI.    PLAINTIFF'S BALD ASSERTIONS ARE NOT ENOUGH

Plaintiff's testimony is conclusory, self-serving, and insufficient as a matter of law to

overcome Summary Judgment.  See Lovelace v. Sherwin-Williams Co., 681 F.2d 230 (4th Cir.

1982).  When asked what information or evidence Plaintiff has to indicate that she was sexually

harassed, she replied, "Just my own testimony."  Pl. Dep. 45.  Further, when asked to identify

any person willing to testify on her behalf for either her sexual harassment claim or retaliation

claim, Plaintiff could only name her husband.  Pl. Dep. 44, 45.  Mr. Rahil and Mr. Akhil Jain

testified that they never witnessed Mr. Raj Jain treat Plaintiff or any other female employee

inappropriately.  Rahil Dep. 60, Dec. 11, 2012; Jain Dep. 80, Dec. 12, 2012, attached as Ex. 33.

The Fourth Circuit has held that a plaintiff's own express, self-serving opinion, that is not

corroborated by more objective ones has no significant probative force.  Lovelace, 681 F.2d at

245.  When evidence is essentially unrefuted, to accept the contrary view, a jury would have to make an inference that is "simply too large to allow in logic and fairness."  Id. at 246.

Plaintiff does not refute that she once had a consensual relationship with Mr. Jain, or that she sent her July 14, 2010 email that accused Mr. Jain of "pulling away for some time now" and set out a demand for $2.5 million coupled with the threat to sue.  Nor does Plaintiff deny that she was behind with deposits, could not account for over $300,000 in accounts receivable, and made significant deposits into the hotel accounts with funds drawn from her own personal bank account.  In her deposition, Plaintiff could offer no legitimate explanation for any of the financial improprieties.  Mr. Jain engaged the assistance of Mr. Rahil to investigate the improprieties, and he provided Plaintiff multiple opportunities to explain herself.  Plaintiff's self serving testimony is insufficient to overcome the overwhelming evidence that undermines her allegations of sexual harassment and retaliation.

## VII.  CONCLUSION

For the foregoing reasons, Defendant is entitled to summary judgment on all of Plaintiff's claims, and for such other and further relief which is proper and just.

Respectfully submitted,

LANDMARK HOTEL GROUP, LLC

By   /s/
William M. Furr (VSB #29554)
Monica A. Stahly (VSB #84492)
Attorneys for Defendant
WILLCOX & SAVAGE, P.C.
One Commercial Place, Suite 1800
Norfolk, Virginia 23510
(757) 628-5500
(757) 628-5566 (Fax)
wfurr@wilsav.com
mstahly@wilsav.com

28

I-1147310.4

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of February, 2013, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system.

I also hereby certify that I will mail the foregoing by U.S. Mail, postage prepaid, to the

following non-filing user:

Michelle D. Pharr
533 West Ocean Acres Drive
Kill Devil Hills, North Carolina 27948

                                                        /s/
                                        William M. Furr (VSB #29554)
                                        Monica A. Stahly (VSB #84492)
                                        Counsel for Defendants
                                        WILLCOX & SAVAGE, P.C.
                                        440 Monticello Avenue, Suite 2200
                                        Norfolk, Virginia  23510
                                        Telephone: 757.628.5500
                                        Facsimile: 757.628.5566
                                        wfurr@wilsav.com
                                        mstahly@wilsav.com